**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.   _____

Jane Doe I and Jane Doe II

      Plaintiff,

v.

9219-1568 Quebec, Inc., a/k/a Aylo, f/k/a MindGeek, d/b/a "Pornhub;" a foreign entity, MindGeek S.A.R.L. a foreign entity; MindGeek USA Inc., a Delaware Corporation; Michael Pratt, in his individual capacity, Matthew Wolfe in his individual capacity, Andre Garcia in his individual capacity, and Valerie Moser in her individual capacity, and GirlsDoPorn, Inc., a business entity (now dissolved); Mastercard, Inc.; Visa, Inc.; Discover Financial Services, Inc.; Feras Antoon, in his individual capacity, Co-Owner of MindGeek, David Tassillo, in his individual capacity; Theodore Gyi in his individual capacity

      Defendants,

---

COMPLAINT AND JURY DEMAND

---

      Ms. Jane Doe I ("Ms. Doe I" or "Plaintiff I"), and Ms. Jane Doe II ("Ms. Doe II" or "Plaintiff II") (collectively "Plaintiffs") by and through counsel, Muhaisen & Muhaisen, LLC, files this Complaint against Defendants, 9219-1568 Quebec, Inc., a/k/a Aylo, f/k/a MindGeek, d/b/a "Pornhub;" a foreign entity, MindGeek S.A.R.L. a foreign entity; MindGeek USA Inc., a Delaware Corporation; Michael Pratt, in his individual capacity, Matthew Wolfe in his individual capacity, Andre Garcia in his individual capacity, and Valerie Moser in her individual capacity, and GirlsDoPorn, Inc., a business entity (now dissolved); Mastercard, Inc.; Visa, Inc.; Discover Financial Services, Inc., Feras Antoon, and David Tassillo,   ("collectively Defendants") and for its claims and causes of action states as follows:

**THE PARTIES**

1. Ms. Doe I is a citizen of the United States, living in Denver, CO.

2. Ms. Doe I is one of the named Plaintiffs in this matter.

3. Given the sensitive nature of this Complaint, at this stage, Ms. Doe I is using a pseudonym.

4. Following the filing of this Complaint, Ms. Doe I is willing to reveal her name, under seal, to the opposing parties and this Court for discovery purposes.

5. Ms. Doe II is a citizen of the United States, living in North Canton, OH.

6. Ms. Doe II is one of the named Plaintiffs in this matter.

7. Following the filing of this Complaint, Ms. Doe II is willing to reveal her name, under seal, to the opposing parties and this Court for discovery purposes.

8. Due to the sensitive, private, and potentially retaliatory nature of Jane Doe I and Jane Doe II's allegations, they request that this Court permit them to proceed under pseudonyms.

9. Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature. For good cause, as exists here, the Court may permit Jane Doe I and Jane Doe II to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or expense.

10. Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and sexual assault. Jane Doe I and Jane Doe II fear the stigma from their family, friends, employer(s),

and community if their true identity is revealed in the public record.

11.    Plaintiffs do not believe any prejudice will befall Defendants by their use of a pseudonym. They will agree to reveal their respective identities to Defendants for the limited purpose of investigating their respective claims once the parties are governed by a protective order.

12.    Jane Doe I and Jane Doe II simply seek redaction of their personal identifying information from the public docket and assurances that Defendants will not use or publish their respective identities that will compromise their personal life or future employment prospects.

13.    Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature. For good cause, as exists here, the Court may permit Jane Doe I and Jane Doe II to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or expense.

14.    Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Jane Doe I and Jane Doe II fear the stigma from their family, friends, employer, and community if their true identity is revealed in the public record.

15.    Defendants will not be prejudiced by Jane Doe I and Jane Doe II's use of a pseudonym.

16.    They, Jane Doe I and Jane Doe II, will agree to reveal their identity to Defendants for the limited purpose of investigating their claims once the parties are governed

by a protective order.

17. Jane Doe I and Jane Doe II simply seek redaction of their personal identifying information from the public docket and assurances that Defendants will not use or publish her identity in a manner that will compromise their personal life or future employment prospects.

18. Aylo, Inc.[1], ("Aylo") is a "pioneer offering world class adult content platform" that, allegedly provides a "trusted environment to enable a safe online user experience." Aylo, *The Intersection of technology and Culture*, https://www.aylo.com/about/ (last visited January 7, 2025) (noting this is from Aylo's "About Us" page).

19. Aylo has locations in Austin, TX, Bucharest, RO, London, UK, Luxembourg, LU, Montréal, CA, and Nicosia, CY. *Id.* ("Contact Us" page).

20. Prior to rebranding, Aylo was known as "MindGeek." Thomas Barrabi, *Pornhub Parent MindGeek Changing Its Name as New Owners Seek 'Fresh Start,'* The New York Post (Aug. 17, 2023) (https://nypost.com/2023/08/17/Pornhub-parent-mindgeek-changing-its-name-under-new-owners/) (last visited January 7, 2025).

21. References to MindGeek are also references to Aylo.

22. Aylo is the parent company of other pornographic websites. These websites include, but are not limited to, Pornhub, YouPorn, RedTube, Tube8, Brazzers, Reality Kings, Digital Playground, and more. Aylo, *Home to Globally Renowned Adult Entertainment Brands*, Aylo.com/brands (https://www.aylo.com/brands/)

---

[1] 9219-1568 Quebec, Inc., is also know as "Aylo" and reference to "Aylo" or "Pornhub" is also reference to 9219-1568 Quebe, Inc.

(last visited January 15, 2025).

23.    Aylo benefits from and is, in effect, Pornhub, YouPorn, Tube8, and its other Pornhub affiliated pornographic websites, as well as the MindGeek entities.

24.    MindGeek U.S.A., Inc., is a corporation that is a subsidiary of Aylo.

25.    Upon information and belief, MindGeek U.S.A., Inc., is located at 2300 W. Empire Avenue, Burbank, CA 91504 and incorporated at 1209 Orange Street, Wilmington, DE, U.S.A.

26.    MindGeek S.A.R.L., is a corporation located in Luxembourg, LU.

27.    Upon information and belief, MindGeek S.A.R.L.'s address is 32 Boulevard Royal Luxembourg City, L-2449, LU.

28.    Aylo has entered into a three year deferred prosecution agreement with the United States Attorney's Office for the Eastern District of New York for conduct related to its relationship with GirlsDoPorn, Inc. ("GDP"), Michael Pratt, Matthew Wolfe, and Andre Garcia. [2]

29.    GDP is a now-defunct pornographic content company that, upon information and belief, was based in San Diego, California, with its principal place of business there.

30.    Upon information and belief, GirlsDoPorn, Inc., when it was operating, was based in San Diego, California.

31.    Upon information and belief, GirlsDoPorn permitted its product to be released in all of the fifty (50) U.S. states as well as their territories and globally.

---

[2] E.D.N.Y. Docket No. 23-CR-463 (BMC).

32.    Upon information and belief, Ruben Andre Garcia ("Mr. Garcia") was an alleged adult film producer who worked for GDP.

33.    Mr. Garcia has pled guilty to sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and (a)(2), and conspiracy to commit sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c), in case number 19CR4488JLS, in the United States District Court, Southern District of California.

34.    The Court sentenced Mr. Garcia to 240 months in a Federal Correctional Institute.

35.    Up information and belief, Mr. Garcia is currently incarcerated at Federal Correctional Institute ("FCI") – Marianna, located at 3625 FCI Road, Marianna, FL 32446.

36.    Upon information and belief, Matthew Isaac Wolfe ("Mr. Wolfe") worked for GDP helping to create "videos."

37.    Mr. Wolfe has pled guilty to conspiracy to commit sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c), in case number 19CR4488JLS, in the United States District Court, Southern District of California.

38.    The Court sentenced Mr. Garcia to 168 months in a Federal Correctional Institute.

39.    Upon information and belief, Mr. Wolfe is currently incarcerated at FCI – Lompoc II, located at 3901 Klein Blvd., Lompoc, CA 93436.

40.    Upon information and belief, Mr. Michael Pratt ("Mr. Pratt") was an owner and producer of GDP and the person who coordinated the relationship between GDP and Pornhub/Mindgeek/Aylo.

41. Mr. Pratt has pled guilty to conspiracy to commit sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c), in case number 19CR4488JLS, in the United States District Court, Southern District of California.

42. Mr. Pratt is currently awaiting sentencing.

43. Mr. Pratt is in the custody of the Federal Government but his exact location is unknown to Plaintiffs' counsel at this time.

44. Upon information and belief, Ms. Valorie Moser ("Ms. Moser") worked for, in some capacity, GDP or assisted in their "video" making process.

45. Counsel is not aware of Ms. Moser's address at the time of this filing.

46. Upon information and belief, GDP is no longer an operating entity and is now defunct, leaving it without an address. At the time it was operating, it was believed to have operated out of San Diego, California.

47. Upon information and belief, Mastercard, Inc., ("Mastercard") is a global credit card company.

48. Upon information and belief, Mastercard's global headquarters is located at 2000 Purchase Street, Purchase NY 10577 U.S.A.

49. Upon information and belief, Mastercard allows its products, credit cards, to be used throughout the United States including, but not limited to, Colorado.

50. Upon information and belief, Visa Inc., ("Visa") is a global credit card company.

51. Upon information and belief, Visa's headquarters is located at One Market Plaza, San Francisco, CA 94105.

52. Upon information and belief, Visa allows its products, including its credit cards, to

be used throughout the United States including, but not limited to, Colorado.

53. Upon information and belief, Discover Financial Services, Inc., ("Discover") is a global credit card company.

54. Upon information and belief, Discover is headquartered at 2500 Lake Cook Road, Riverwoods, IL 60015.

55. Upon information and belief, Discover allows its products, including its credit cards, to be used throughout the United States including, but not limited to, Colorado.

56. Upon information and belief, Mr. Feras Antoon ("Mr. Antoon") began MindGeek.

57. As stated previously, MindGeek became Aylo.

58. At the time of this filing, Counsel does not have an address for Mr. Feras Antoon and will supplement this filing when they do.

59. Upon information and belief, Mr. David Tassillo ("Mr. Tassillo") also held a significant ownership role at MindGeek.

60. As stated previously, MindGeek became Aylo.

61. At the time of this filing, Counsel does not have an address for Mr. Tassillo and will supplement this pleading when they do.

62. Upon information and belief, Mr. Theodore Gyi ("Mr. Gyi") worked for GDP and helped to create "videos" and film them.

63. Mr. Gyi pled guilty to "conspiracy to commit sex trafficking" and was sentenced to 48 months in case number 19CR4488JLS, in the United States District Court, Southern District of California.

64.    Upon information and belief, Mr. Gyi resides at the Residential Reentry Management Field Office located at 1299 Seaside Avenue San Pedro, CA 90731.

## PERSONAL AND SUBJECT MATTER JURISDICTION

65.    Ms. Doe I and Ms. Doe II hereby incorporate all previous paragraphs.

66.    This Court has personal and subject matter jurisdiction over this case.

67.    Plaintiffs bring claims that involve parties, the majority of whom are residents of different states establishing diversity jurisdiction. 28 U.S.C. § 1332(a)(1).

68.    Ms. Doe I is a resident of Colorado. *Id.*

69.    A significant portion of Ms. Doe I's injuries occurred and continue to occur in Colorado.

70.    Ms. Doe II is a resident of Ohio. *Id.*

71.    A significant portion of Ms. Doe II's injuries occur in Colorado an Ohio.

72.    Defendants are residents of California, New York, Canada, or unknown states at the time of filing. *Id.*

73.    This action also arises under laws of the United States. 18 U.S.C. §§ 1591, 1595.

74.    The amount in controversy is above $75,000.00. 28 U.S.C. § 1332(a).

75.    Venue is proper as the sexual assault video in question existed in all states, including Colorado. 28 U.S.C. § 1391(b)(2).

76.    Defendants systematically conduct substantial business activities in Colorado.

77.    This Court has personal jurisdiction as all Defendants create a product that has sufficient minimum contacts in Colorado. *See, International Shoe v. Washington*, 326 U.S. 310 (1945).

**GENERAL ALLEGATIONS**

**I. DEFENDANTS**

78.     Jane Doe I and Jane Doe II hereby incorporate all previous paragraphs.

79.     On December 20, 2023, Defendant Aylo entered into a three-year deferred prosecution with the United States Attorney's Office for the Eastern District of New York ("the Office") to avoid prosecution for its conduct related to its relationship with Defendants GirlsDoPorn, Inc., Michael Pratt, Matthew Wolfe, and Andre Garcia.[3]

80.     The Deferred Prosecution, properly executed by Aylo, through its representatives, states, "The Company admits, accepts and acknowledges that (a) it is responsible under United States law for the acts of its officers, directors, employees and agents with respect to the conduct described in the Information and the Statement of Facts, and (b) the facts described in the Statement of Facts are true and accurate."[4]

81.     Plaintiffs incorporate the following Exhibit 1, *infra*, which includes an excerpt from the "Statement of Facts", acknowledged and agreed to by Defendant Aylo, as set out in the Deferred Prosecution Agreement that Aylo entered into with the Office.

**EXHIBIT 1 (pages C-1 through C-12 of Deferred Prosecution Agreement between Aylo and the Office – Exhibit 1 ends where paragraph 82 begins)**

ATTACHMENT C
STATEMENT OF FACTS

---

[3] E.D.N.Y. Docket No. 23-CR-463 (BMC).
[4] Page 2, paragraph 2, of the deferred prosecution.

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "United States") and the defendant Aylo Holdings S.À.R.L., formerly known as "MindGeek S.à.r.l. (together with its wholly-owned subsidiaries and affiliated entities, "MindGeek" or the "Company"). Certain of the facts herein are based on information obtained by the United States from third parties, through its investigation, and described to MindGeek. MindGeek admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, MindGeek agrees that it will neither contest the admissibility of, nor contradict, the facts in this Statement of Facts in any such proceeding. The following facts took place in or about and between January 2009 and December 2020, unless otherwise noted, and establish beyond a reasonable doubt the charges set forth in the Information attached to the Agreement.

<u>The Defendant MindGeek and Affiliated Entities</u>

1.  From in or about and between January 2009 and December 2020, MindGeek was a global, privately held group of entities (including MindGeek USA, Inc., MG Freesites Ltd. and MindGeek S.à.r.l.), the business of which included the maintenance and operation of websites that enabled third parties to post and distribute adult videos. MindGeek owned and operated numerous pornographic websites and brands including Pornhub.com ("Pornhub"). MindGeek's websites were accessible within the United States through an internet connection, including in the Eastern District of New York.

2.  MindGeek S.à.r.l. was the ultimate corporate parent company for MindGeek USA, Inc. and MG Freesites Ltd. MindGeek S.à.r.l. was a foreign entity organized and existing under the laws of Luxembourg. Although its corporate headquarters was in Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and, among other places, Los Angeles, California.

3.  MindGeek offered to the public both free and paid adult websites. MindGeek allowed users to access content for free on certain of its websites, including on Pornhub, YouPorn.com, RedTube.com, Tube8.com and Thumbzilla.com (collectively the "FreeSites"). Pornhub was MindGeek's flagship video-sharing platform and its leading free, ad supported, adult content hosting and streaming website, offering visitors the ability to view content uploaded by users, models and third-party adult entertainment companies. MindGeek also owned or operated websites that required users to purchase a membership to access their content. These sites included the MindGeek-owned PornhubPremium.com ("Pornhub Premium"), YouPornPremium.com and RedTubePremium.com (collectively, the "Premium Sites"), which provided paid subscribers with additional, exclusive model or third-party-studioproduced content in an ad-free environment behind a paywall.

4.  MindGeek offered third-party adult entertainment companies the ability to become content partners ("Content Partners") and members of its content partner program ("Content Partner Program"). Content Partners were generally third-party adult entertainment companies that operated their own website(s), which offered content to users for a fee or via paid subscription. Under the Content Partner Program, when a third-party entertainment company signed up to be a Content Partner with MindGeek, MindGeek offered the Content Partner separate webpages that included channels on Pornhub and its other Free Sites. Content Partners could upload content onto the Free Sites, and place advertisements on their channels and video watch pages with links to the Content Partners' websites. MindGeek promoted the Content Partners to its users. For example, each personalized channel contained a link to the Content Partner's website. These advertisements and links directed users to go to the Content Partner's website where they could be converted to paying members of the Content Partner's website. When a user referred through such advertisements or links purchased a subscription to the Content Partner's website, where applicable, MindGeek earned a commission, or a share of the revenue earned by the Content Partner.

5.  MindGeek also offered its Content Partners the ability to join a view share program ("View Share Program") for Pornhub Premium by signing a content license agreement. The View Share Program was designed for Content Partners to promote their content and help them earn revenue based on views of their content by subscribers of Pornhub Premium. Under the View Share Program, the Content Partner could upload videos that were locked behind a paywall and thus only available to users who purchased a subscription. Content Partners in the View Share Program were compensated based on views of their videos. MindGeek helped drive users to the Content Partners by, among other things, promoting links to its users to join the Content Partners' pay-sites.

### Other Relevant Entities and Individuals

6.  GirlsDoPorn.com ("Girls Do Porn" or "GDP") was a pornography website featuring videos of young women from 18 to 23 years old engaging in sexual intercourse with a male actor. GDP promoted the women in the videos as amateur college-aged women filming pornography for the first time. GDP's channel on Pornhub advertised: "Real amateur girls having sex on video for the very first time . . . . You will not find these girls on any other website - all girls are 100% exclusive - this is the one and only time they do porn." GDP earned money by selling subscriptions to view the complete video content in its members-only section. The Girls Do Porn channel on MindGeek's platforms, including Pornhub, was popular, with more than 700,000 subscribers and more than 60 million unique page views during the relevant time period.

7.  GirlsDoToys.com ("Girls Do Toys" or "GDT") was a pornographic website featuring young women in "solo" scenes (i.e., using sex toys). GDT videos featured many of the same women who appeared in GDP videos. The GDT channel on MindGeek's platforms had more than 780,000 unique page views between January 2009 and December 2020.

8.  Michael James Pratt ("Pratt") and Matthew Wolfe ("Wolfe"), both citizens of the United States, together with others (collectively, the "GDP Operators"), ran an online pornography business in which they operated several pornography websites, including Girls Do Porn and Girls Do Toys. The GDP Operators used numerous entities to operate their pornography enterprise, including the following: BLL Media, Inc.; BLL Media Holdings, LLC; Domi Publications, LLC; and M1M Media, Inc.

9.  The GDP and GDT videos hosted by MindGeek were accessible in, and were, in fact, accessed by, users within the Eastern District of New York.

<u>The Unlawful Monetary Transactions</u>

10. In or about and between September 15, 2017 and October 2019, MindGeek operated and hosted GDP and GDT content on its Free Sites, including on Pornhub, and knowingly received payments of approximately $106,370.05 through United States financial institutions, from the GDP Operators. Those proceeds were criminally derived from the GDP Operators' sex trafficking. All the above-mentioned monetary transactions occurred in the United States, including in the Eastern District of New York. Moreover, between September 2017 and December 2020, MindGeek received payments from advertisers attributable to GDP and GDT content totaling approximately $763,890.72.

**Background**

<u>Contractual Relationships Between GDP Operators and MindGeek</u>

11. Beginning in or about 2009, Pratt joined MindGeek's Content Partner Program. On or about December 2, 2015, BLL Media, Inc. entered into a content license agreement ("Content License Agreement") with MindGeek. Pratt signed the contract on behalf of BLL Media, Inc.

12. On or about March 4, 2016, Domi Publications LLC entered into a Content License Agreement with MindGeek. Pratt also signed the contract on behalf of Domi Publications LLC.

13. In 2016, Wolfe joined MindGeek's Content Partner Program. On or about October 11, 2016, M1M Media, Inc. entered into a Content License Agreement with MindGeek. Wolfe signed the contract on behalf of M1M Media Inc.

14. Pursuant to the above Content License Agreements, in or about and between September 14, 2009 and October 14, 2019, MindGeek created and operated GDP channels for Pratt and the GDP Operators on its Free Sites, including on Pornhub. In or about and between January 28, 2016 and December 16, 2020, MindGeek also created and hosted a GDT channel for Wolfe and the GDP Operators on its Free Sites, including on Pornhub. The GDP and GDT channels contained mostly 5- to 7-minute clips of videos filmed by the

GDP Operators and included links to their paid websites so that users could access the full videos.

<u>GDP Lawsuit</u>

15. In June 2016, multiple plaintiffs filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Ruben Andre Garcia ("Garcia"), BLL Media, Inc., BLL Media Holdings, LLC, Domi Publications, LLC, M1M Media, LLC and others alleging that the civil defendants had tricked the plaintiffs into appearing in pornographic videos posted to Girls Do Porn (the "GDP Lawsuit"). The complaint alleged, among other things, that the civil defendants had offered the plaintiffs money for adult film work and assured them that the civil defendants would not post the videos online or distribute the videos within the United States, and would keep the plaintiffs' identities anonymous. The complaint further alleged that the civil defendants coerced the plaintiffs into signing consent release forms and having sex with one of the civil defendants. Moreover, the complaint alleged that some of the plaintiffs' videos had been posted to Pornhub without the plaintiffs' consent.

16. MindGeek was notified of the GDP Lawsuit, at the latest, on or about September 15, 2017, after it received a subpoena for production of business records from plaintiffs' counsel in the GDP Lawsuit.

17. Separately, after the filing of the GDP Lawsuit, between August 2016 to August 2019, MindGeek received at least 15 content removal requests, from at least 11 complainants seeking to have Pornhub remove GDP videos on its platform. The complainants stated that videos in which they appeared had been posted on Pornhub without their consent and that the producers who made the GDP videos lied to them about not posting the videos online. Some of the content removal requests also made reference to the GDP Lawsuit. MindGeek sought, and received, information from GDP that purported to establish that the complainants had given consent for their videos to be posted online, but MindGeek did not independently verify consent. MindGeek removed some, but not all, of the GDP videos as requested.

18. For example, on or about August 29, 2016, a complainant asked Pornhub to remove a GDP video, stating that GDP "made me believe that this will be distributed to foreign countries to private members only. It has strongly impacted my professional and social life." Pornhub did not remove the requested video and instead responded that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a Digital Millennium Copyright Act ("DMCA") takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

19. On or about October 19, 2018, a complainant submitted a content removal request to Pornhub asking Pornhub to remove a video, stating that she "did not agree to have this content on pornhub." Later that day, Pornhub informed the complainant that the video would be removed.

20. On or about November 1, 2018, a complainant submitted a content removal request to Pornhub asking the company to remove four videos. In the complaint, the writer stated that the individual in the video was her friend and that her friend was "lied to," told "it would never go online," and "never told [] the company they work for." In response, Pornhub stated that the complainant needed to "contact girls do porn to have the video removed, because the video is sponsored content."

21. On or about March 2, 2019, a complainant submitted a content removal request to Pornhub asking the company to remove a GDP video. In the request, she stated that she "was told this video would never be online. I did not consent to have this on Pornhub! Please take this down. It is ruining my life." Pornhub responded and stated that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a DMCA takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

22. On or about June 16, 2019, a complainant submitted a content removal request to Pornhub, stating that she "was lied to in order for this video to be filmed." On June 17, 2019, Pornhub informed the complainant that the video had been removed.

23. In or about and between June and July 2019, MindGeek executives also became aware, through public sources, that the GDP Lawsuit was proceeding to trial over allegations that women were tricked into making the GDP videos. For example, on or about June 28, 2019, a senior MindGeek employee received an alert of a VICE article titled, "Girls Do Porn Goes to Trial Over Allegations Women Were Tricked into Videos." The article was circulated and discussed among MindGeek's employees, including senior executives.

24. In or about and between late June and July of 2019, MindGeek executives discussed whether to remove the GDP videos implicated in the GDP Lawsuit. On July 15, 2019, a senior MindGeek employee explained that she has "contacted [Pratt] and let him know that we would suspend their channel at the end of the week if we don't hear back.

25. On or about July 18, 2019, MindGeek separately contacted plaintiffs' counsel in the GDP Lawsuit and requested a list of GDP content that the company should remove from its website. MindGeek then removed the videos identified by plaintiffs' counsel.

26. However, MindGeek did not deactivate, suspend or remove the official GDP and GDT channels at that time.

27. Instead, on or about July 19, 2019, several MindGeek executives identified GDP as an "untrusted partner." Specifically, a senior MindGeek employee emailed another senior MindGeek employee and stated that GDP was on its list of "untrusted partners." The MindGeek executives agreed that with respect to an "untrusted partner," upon receiving any complaints from the individuals who appeared in the videos, MindGeek would "inactivate the videos immediately and reach out to the Content Partner to tell them we've taken down the video. If they contest it, it will be case by case. For full DMCA requests, we will DMCA the video and the partner can counter." Despite this, MindGeek left the GDP and GDT channels on MindGeek's websites.

28. On or about August 20, 2019, the bench trial in the GDP Lawsuit commenced in San Diego Superior Court. Throughout the trial, MindGeek employees reviewed news media articles reporting on the trial. For example, on or about August 30, 2019, a senior MindGeek employee received a news article reporting that a GDP videographer, Theodore "Teddy" Gyi ("Gyi"), had testified during trial that he, at the direction of the GDP Operators, lied to women that their sex videos would not appear online so that the women would agree to appear in the videos. The article further stated that videos Gyi shot were posted on MindGeek's Free Sites such as Pornhub and YouPorn.

29. On or about October 10, 2019, the U.S. Attorney's Office for the Southern District of California charged Pratt, Wolfe, Garcia and Valorie Moser by complaint on federal sex trafficking charges. The criminal complaint specifically referenced Girls Do Porn and Girls Do Toys and also stated that pornographic videos posted to Girls Do Porn and Girls Do Toys were also posted on Pornhub.

30. On or about October 14, 2019, MindGeek, at the direction of its Chief Operating Officer, removed the official Girls Do Porn channel from its platforms. However, MindGeek did not remove the official Girls Do Toys channels from its platforms or seek to identify for removal all unofficial Girls Do Porn content from its websites at that time. As a result, users could still access numerous GDP videos on MindGeek's Free Sites, including Pornhub.

31. MindGeek did not receive any payments from the GDP Operators after October 2019, including for GDT content.

32. In or about November 2019, a federal grand jury returned an eight-count indictment against Pratt, Wolfe, Garcia, Gyi and other conspirators in the Southern District of California on charges of sex trafficking, conspiracy to commit sex trafficking, and production of child pornography.

33. After the above referenced individuals were indicted, between November 2019 and January 2020, MindGeek continued to receive complaints from individuals seeking to remove GDP content from its platforms. For example, in November 2019, one individual contacted Pornhub and explained that while Pornhub had removed the official channel, a

simple search for "Girls Do Porn" or "GDP" on the website produced clips and compilations uploaded from Pornhub users. Later, MindGeek removed all identified videos from its sites.

34. On or about January 2, 2020, the court in the GDP Lawsuit issued a public Statement of Decision, finding the GDP Operators liable. The Statement of Decision explained that the GDP Operators used a number of fraudulent and threatening practices to recruit women to make pornographic images, including posting misleading ads to recruit women, falsely promising more pay than they intended, lying to the women about how, where and to whom their videos would be distributed and using coercive tactics to force the women to perform sex when necessary. The court noted that with respect to Girls Do Toys, "the women are usually the same as those who shoot boy-girl GDP videos because [the GDP Operators] do not separately recruit women for solo videos."

35. On or about January 3, 2020, a MindGeek executive received notification of the decision through a news alert with a link to an article titled, "Girls Do Porn Has to Pay Millions in Damages for Coercing Women Into Porn."

36. On or about January 23, 2020, four MindGeek executives received an email from MindGeek's external consultant. MindGeek's external consultant forwarded the executives a list of email inquiries from VICE magazine, including the following inquiry: "Girls Do Toys, a site that is owned and operated by the same people that own and operate Girls Do Porn, still has an official channel on Pornhub. Some of the women in the Girls Do Toys videos are the same women from the Girls Do Porn videos. Why has Pornhub allowed this channel to remain on its platform?"

37. On or about February 10, 2020, Pornhub conducted a sweep to remove all existing GDP content from its site. Nonetheless, users continued to post GDP-created content on Pornhub. In or about and between May 2020 and December 9, 2020, MindGeek continued to receive content takedown requests from individuals seeking to remove user-posted GDP video content. After receiving the requests, MindGeek then removed the identified videos.

38. On or about June 18, 2020, a senior MindGeek employee forwarded to a MindGeek executive a May 1, 2019 email that had originally been sent from Pratt to a Pornhub account representative. In the forwarded email, which discussed a female complainant who had submitted to MindGeek a content removal request to remove her GDP video, Pratt informed the Pornhub representative that the female complainant had also appeared in a GDT video.

39. MindGeek did not remove the official GDT channel from its websites until on or about December 16, 2020, even though the company knew that the individuals operating GDT were the same as those who operated GDP and that many of the individuals featured in GDP videos were also used to produce GDT content.

82. Federal law defines the crime of sex trafficking as knowingly recruiting, enticing, harboring, transporting, or soliciting a person to engage in a commercial sex act knowing or in reckless disregard of the fact that force, threats of force, fraud, coercion, or any combination thereof were used in the process. 18 U.S.C. § 1591(a)(1). A person also commits criminal sex trafficking if he or she knowingly benefits, financially or by receiving anything of value, from participation in a venture engaged in sex trafficking if the person knows or has recklessly disregarded the fact that illegal means were used in the process. 18 U.S.C. § 1591(a)(2).

83. Plaintiffs Doe 1 and Doe 2 are victims of human sex trafficking defined in 18 U.S.C. § 1591 *et al*. Defendants benefited financially, both directly and indirectly, from the Plaintiffs' victimization.

84. Defendants GirlsDoPorn, Inc., Mr. Pratt, Mr. Wolfe, Mr. Garcia, Mr. Gyi, and Ms. Moser, engaged in a conspiracy to commit sex trafficking sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c).

85. Plaintiffs were among the hundreds of young women who are victims of this conspiracy.

86. Defendant Aylo enabled this conspiracy to occur for years by entering into "content partner" relationship with Defendants GirlsDoPorn, Inc. and Pratt, while failing to monitor the content for consent, manipulation, or sexual assault produced by those Defendants who were given their own channel on the Aylo platform, i.e., pornhub.com *et al*. Aylo promoted the GirlsDoPorn, Inc. content because it both

directly and indirectly benefited Aylo by bringing millions of viewers to its own websites. Further, Aylo provided direct links to the GirlsDoPorn, Inc. website that directed people directly to the sexual trafficked content.[5]

87. Aylo entered into a "content license agreement" Defendants GirlsDoPorn, Inc. and Pratt.[6]

88. Aylo, via pornhub.com *et. al.*, operated as aggregator website for pornographic material, or "tube site." That is, it provided content uploaded to it websites by many sources from all around the world. It is essentially a search engine for pornographic material much in the same way that Google is a search engine. Aylo did not sufficiently monitor the videos being uploaded to its websites, including pornhub.com, to ensure that those websites were not being used to enable criminal behavior such as sex trafficking or rape.

89. Aylo ignored requests for this illegal content to be removed from many of the victims of the GirlsDoPorn, Inc. conspiracy, including Plaintiffs Doe I and Doe II. In some cases, Aylo attorneys responded to such requests with assertions that those victims had entered into valid contracts for the distribution of the material. It is believed that Aylo, nor its attorneys, had ever reviewed or did ever review the contracts that Defendants GirlsDoPorn, Inc. and Mr. Pratt claimed to be valid.

90. Aylo's failure to monitor its websites for illegal content not only caused acute victimization of the Plaintiffs during the period that these videos were on the Aylo

---

[5] *See*, paragraphs 11-14 of Exhibit 1.
[6] *Id.*

websites, but also continuous and lifelong victimization. Videos on the Aylo websites such as pornhub.com are visible to millions of people all over the world. Videos can be downloaded onto hard drives of any or all of those millions of people, and may be shared on other websites at any time; now or in the future. To this day, upon information and belief, the Plaintiffs' videos can be found online either in the format that they were produced, or in compilation videos. It is impossible to completely remove those videos from the worldwide internet or to ensure that someone who has these videos on a hard drive somewhere, either here in the United States, or elsewhere, will not share them to another aggregator website such as pornhub.com at any time in the future.

91.     Aylo's failure to remove these videos from its websites, after receiving requests from the victims of this sexual trafficking conspiracy, and even after its executives became aware that there were both criminal indictments and a civil lawsuit, suggests that it knew that the content was created in violation of sex trafficking statutes, but certainly demonstrates that it recklessly disregarded the criminality that was directly in front of them, and should have known what was occurring and how it was enabling this victimization to continue.

92.     Mr. Antoon and Mr. Tassillo purchased Aylo in or about 2013 and served as its Chief Executive Officer and Chief Operating Officer, respectively, until in or about 2022.

93.     Mr. Antoon and Mr. Tassillo benefitted financially, both directly and indirectly, from content available on Aylo's websites, including pornhub.com *et al.*

94.     Upon information and belief, Defendants Antoon and Mr. Tassillo failed to ensure that their company, Aylo, was not facilitating crimes related to sex trafficking.

95.     It is believed that Mr. Antoon and Mr. Tassillo became aware that the content from GDP and Mr. Pratt was derived from a sexual trafficking conspiracy, in June or July of 2019. These Defendants did not take appropriate measures to remove this content from Aylo's websites despite this knowledge for approximately eighteen months.[7]

96.     Defendants Mastercard, Inc.; Visa, Inc.; Discover Financial Services, Inc. each benefited financially from content available on Aylo's websites, including pornhub.com *et al*. They each had agreements with Aylo to operate as a payment gateway for the millions of people who would come to these websites and pay to view content, including the criminally derived content produced by Defendants GirlsDoPorn, Inc. and Pratt. It is believed that these Defendants did not use due diligence to ensure that the sexually explicit material on the Aylo websites was legally produced and not the result of sex trafficking. These Defendants should have known that they were benefitting financially from the victimization of hundreds of young women, including Plaintiffs Doe 1 and Doe 2.

## II. MS. DOE I

### A.  INITIAL CONTACT

97.     Plaintiffs hereby incorporate all previous paragraphs.

98.     In 2014, Ms. Doe I received an email from Mr. Garcia.  The exact date is unknown.

---

[7] *See*, Paragraph 16 of Exhibit 1.

99.     Ms. Doe I was either nineteen (19) or twenty (20) years old at the time she began speaking with Mr. Garcia.

100.    Mr. Garcia contacted Ms. Doe I about beginning a modeling career.

101.    Upon information and belief, this modeling career involved photographing Ms. Doe I clothed.

102.    Mr. Garcia and Ms. Doe I spoke for approximately one (1) year prior to meeting. Mr. Garcia befriended Ms. Doe I and even led her to believe that he was interested in her romantically. Over the course of this time period, Mr. Garcia was able to get Ms. Doe I to trust him to be honest with her and to keep her safe when they would later meet in person.

103.    Mr. Garcia was "grooming" Ms. Doe I to be a victim to, among other things, "sex trafficking by force, fraud, or coercion; Title 18, U.S.C., Section 1594(c)"[8] of which Mr. Garcia, Mr. Pratt, Mr. Wolfe, Mr. Gyi, and Ms. Moser, would later indicted for by a Federal grand jury in January of 2019.[9]

104.    "While grooming is widely associated with the sexual exploitation of children, it is also a critical precursor to human trafficking, …. It is a universal tactic, employed by traffickers, abusers, cult leaders, exploitative influencers, and organized criminal groups alike…. Grooming is an intentional, calculated, and systematic approach used by traffickers to gain psychological control over victims, preparing and conditioning them for exploitation. It occurs both online and offline, leveraging

---

[8] Count One of Federal Indictment filed by Grand Jury in January of 2019, Case No. 19CR4488JLS.
[9] *Id.*

emotional connections, positions of authority, deception, and social or economic vulnerabilities. By gradually eroding a victim's defenses, traffickers can manipulate individuals into compliance and silence, often before victims recognize the danger."[10]

105.     Mr. Garcia and Ms. Doe I talked through multiple mediums, including, but not limited to, Facetime, texts, emails, and Facebook messenger.

106.     Eventually, Mr. Garcia invited Ms. Doe I to California.

107.     Mr. Garcia mentioned to Ms. Doe I that there was a potential modeling photo shoot she could be a part of.

108.     Mr. Garcia offered Ms. Doe I up to seven thousand dollars ($7,000.00) per modeling photo shoot.

109.     Mr. Garcia offered to pay for Ms. Doe I's flight and hotel. Mr. Garcia offered to take care of everything for Ms. Doe I if she agreed to come to California as he was requesting.

110.     Mr. Garcia offered to pay to also pay for an additional flight for a friend if Ms. Doe I wanted to bring one along.

111.     Ms. Doe I was not from California but agreed because she aspired to be a model, was a financially destitute college student, and because she trusted Mr. Garcia.

**B. TRIP TO CALIFORNIA**

112.     Plaintiffs hereby incorporate all previous paragraphs.

---

[10] Alana Stott, Grooming & Human Trafficking: The Hidden Pipeline of Exploitation, (Apr. 7, 2025) chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.jurispro.com/files/articles/groomingwhitepaper_9564.pdf (also on jurispor.com) (last visited June 16, 2025).

113.     Ms. Doe I decided to go to California.

114.     In making her decision, Ms. Doe I was under the belief she would be doing a fully clothed modeling photo shoot. This is what Mr. Garcia had told her numerous times while he was convincing her to travel to California.

115.     Ms. Doe I did not tell her mother or any other family members about this trip.

116.     One of her best friends, Ms. Halle Craig,[11] decided to take the trip with her.

117.     They flew out to California in June of 2015.

118.     Mr. Garcia picked up both from the airport.

119.     Mr. Garcia took Ms. Doe I and Ms. Craig to a residence that he asserted to be his.[12]

120.     Once at Mr. Garcia's place, he offered both of them alcohol, even offering to go get them some.

121.     He also offered them marijuana.

122.     Mr. Garcia offered them alcohol despite knowing they were not of legal drinking age.

123.     Mr. Garcia gave Ms. Doe I a Xanax.[13]

124.     This Xanax was given to Ms. Doe I to calm any anxiety she was having.

125.     Mr. Garcia then informed Ms. Doe I that she had a "photo shoot" that same day, on or about June 29, 2015.

---

[11] To Counsel's knowledge, Ms. Craig has, at some point, married a person with the last name "Foster." It is unclear at the time of this filing whether Ms. Craig goes by "Ms. Halle Craig," "Ms. Halle Foster," or a separate name altogether. For purposes of this Complaint, Counsel will refer to her as "Ms. Craig."
[12] Upon information and belief, the location of Mr. Garcia's may have been either a house, condo, or an apartment.
[13] Xanax is the common name for alprazolam, which is a drug used to treat, in part, anxiety. WebMD, *Alprazolam (Xanax) Uses, Side Effects and More*, G. Karthik Kumar, reviewed by Beth Johnston https://www.webmd.com/drugs/2/drug-9824/xanax-oral/details (last visited January 5, 2025).

126.  Mr. Garcia told Ms. Doe I to go to the bedroom.

127.  Mr. Garcia's "roommate" then arrived.

128.  He introduced himself as "Ben."

129.  "Ben" was really Matthew Wolfe.[14]

130.  Only when Ms. Doe I inquired about what kind of photo shoot it was, was she told it would be a pornographic video shoot.

131.  Ms. Doe I never agreed or consented to, in any way, shape, or form, to doing the acts that would be involved in the sexual assault video.

132.  She informed Mr. Garcia that she would not be participating in a pornographic photo shoot.

   i.  *Intimidation & Manipulation*

133.  Plaintiffs hereby incorporate all previous paragraphs.

134.  Mr. Garcia's demeanor changed suddenly after Ms. Doe I informed him she would not participate in a pornographic video shoot.

135.  Mr. Garcia became aggressive.

136.  Mr. Garcia was angry with Ms. Doe I for not being willing to participate in such a photo shoot.

137.  Knowing that Ms. Doe I was broke and did not have money to get herself back to

---

[14] Both Mr. Garcia and Mr. Wolfe have been charged criminally, convicted and sentenced. *See,* United States Attorney's Office – Southern District of California, *Twenty-Year Sentence in GirlsDoPorn Sex Trafficking Conspiracy*, https://www.justice.gov/usao-sdca/pr/twenty-year-sentence-girlsdoporn-sex-trafficking-conspiracy, (Jun. 14, 2021) (last visited January 5, 2025), and United States Attorney's Office – Southern District of California, *Friend and Business Partner of GirlsDoPorn Owner Michael Pratt Sentenced to 14 Years in Prison*, (Mar. 19, 2024) https://www.justice.gov/usao-sdca/pr/friend-and-business-partner-girlsdoporn-owner-michael-pratt-sentenced-14-years-prison (last visited January 5, 2025).

Colorado, he told her that she owed him eight thousand dollars ($8,000.00) for the flights and hotel room as well as a "booking fee."

138. He also "reminded" her of the illegal activities she had partaken in since her arrival, such as consuming marijuana.

139. Next, he tried calming Ms. Doe I.

140. Mr. Garcia told Ms. Doe I that it was "not a big deal" and that any footage would not "go anywhere."

141. Ms. Doe I and her friend were broke, young college students, alone, and in an unfamiliar city with two men they did not know well.

142. The pressure was immense.

143. As a result of this pressure, the intimidation, and the repeated promises that the video would not be published anywhere in any form, Ms. Doe I only participated in the shoot, for her safety and because she believed that she did not have any other choice. Ms. Doe I still wanted to believe that Mr. Garcia liked her, was interested in her romantically, and was looking out for her best interests. This was fantastical thinking of a young, naïve, woman still wanting to trust people. This thinking would soon be shattered by the actions of Mr. Garcia and the other Defendants.

144. Ms. Doe I requested further reassurances that any items, photographs, videos, or otherwise, would not be distributed anywhere and that she would not have to perform sexual acts.

145. Again, Mr. Garcia reassured Ms. Doe I of this, promising her that he was telling her the truth.

146.    She "agreed" to do the video shoot.

147.    Mr. Garcia said that the pornographic photo shoot was in one hour.

## C. THE "PHOTO SHOOTS"

148.    Plaintiffs hereby incorporate all previous paragraphs.

149.    Ms. Doe I and her friend were then driven to a separate location. Upon information and belief this separate location was a hotel; though Ms. Doe I is unsure which hotel it is at this time. Nobody spoke on this drive to the hotel. Ms. Doe I was scared.

150.    Once they arrived at the hotel, Ms. Craig was placed in the bathroom. Ms. Craig was explicitly told that she was not part of the "photo shoot" and would have to wait for its entirety in the bathroom.

151.    The bathroom was locked and Ms. Craig was given an iPad and headphones.

152.    Once Ms. Craig was disposed of, Ms. Doe I was given a romper[15] to put on. Mr. Garcia and Mr. Wolfe, whom Ms. Doe I believed was "Ben." They took photographs of Ms. Doe I in the romper.

153.    Ms. Doe I was then informed that Mr. Garcia would be the "male" in the "photo shoot" and was going to be a partner.

154.    She was then given a contract to sign.

155.    Ms. Doe I was not given adequate time to read over the contract, but believes it was from "Bulldog Entertainment."[16]

---

[15] A "romper" is "a piece of clothing consisting of a shirt with attached shorts." Vocabulary.com, *Romper*, https://www.vocabulary.com/dictionary/romper#:~:text=A%20romper%20is%20a%20piece,ll%20see%20toddlers%20wearing%20rompers (last visited January 7, 2025). Romper is also defined as "a loose, one-piece garment combining a shirt or blouse and short, bloomerlike pants" worn by women. Dictionary.com, *Romper*, https://www.dictionary.com/browse/romper (last visited January 7, 2025).

[16] Counsel looked into whether "Bulldog Entertainment" is a real or fictitious association. One search returns a

156.     While attempting to review the "contract" Ms. Doe I was told to just sign the document and that she would be given a copy.

157.     Ms. Doe I was alone in the room when signing this contract. She was with two male figures whom she did not know very well. These male figures had already been aggressive and agitated with her. She was far from home and her only friend was locked up in a bathroom and may not have been able to hear anything.

158.     Ms. Doe I recalls the contract saying it was from "Bulldog Entertainment."

159.     The "contract" Ms. Doe I signed is a sham.

i.     *The First "Photo Shoot"*

160.     Plaintiffs hereby incorporate all previous paragraphs.

161.     Upon information and belief, the "photo shoot" lasted seven (7) hours. Soon after Mr. Garcia the "male partner" entered into the photoshoot the sexual assault began.

162.     The original "photo shoot" was only supposed to be for modeling clothes. While Ms. Doe I was allegedly told it would include some nudity, she was never informed, nor consented to, any kind of pornographic shoot.

163.     During the video of her sexual assault, Ms. Doe I began to bleed as a result of injuries to her vagina. Filming had to stop several times as a result of this.

164.     Ms. Doe I was crying repeatedly throughout the sexual assault which also required the filming to stop.

165.     Both Mr. Wolfe and Mr. Garcia berated Ms. Doe I because she was crying.

---

response for an entertainment business based in Fresno, CA (https://bulldogeventgroup.com/bulldog-entertainment-co/). It is unclear if this is the "Bulldog Entertainment" in question.

166.    Due to this traumatic experience, Ms. Doe I blacked out[17] and cannot remember everything that occurred.

167.    Despite years of therapy, Ms. Doe I has still not been able to get past this mental black out.

168.    After the sexual assault, Mr. Garcia gave Ms. Doe I four thousand dollars ($4,000.00) in cash. He told her to do whatever she wanted with it. Mr. Garcia had previously told her it would be seven thousand ($7,000.00) in cash, but that Ms. Doe I was "too skinny."

169.    Ms. Doe I initially refused the money. Mr. Garcia told her that she had to take the money because he claimed he was legally obligated to pay her.

170.    Mr. Garcia then informed Ms. Doe I that Ms. Craig would be leaving that same day and flying home. Ms. Doe I, however, was forced to stay and Ms. Craig was taken to the airport.

171.    Mr. Garcia then told Ms. Doe I she would have to film a "solo shoot" before she could leave which would occur the next day.

172.    Mr. Garcia and Mr. Wolfe then left Ms. Doe I in the hotel room, alone, and did not give her a key to the room. She was told not to call the lobby. She was not given any food.

173.    She remained in the room until around 4:00 PM the next day.

*ii.    The Second "Photo Shoot"*

---

[17] "Blacked out" is an intransitive verb defined as undergoing "a temporary loss of vision, consciousness, or memory[.]" Merriam-Webster Dictionary, *Black Out*, https://www.merriam-webster.com/dictionary/blackout (last visited January 7, 2025).

174.    Upon information and belief, around 4:00 PM Mr. Garcia, Mr. Wolfe, and, upon information and belief, a woman named Valorie Moser ("Ms. Moser").[18]

175.    Ms. Moser tried to calm Ms. Doe I telling her everything would be alright. Ms. Moser told Ms. Doe I that a "solo shoot" only meant use of "sex toys."

176.    Eventually, Mr. Garcia left, and Ms. Doe I began the "solo shoot."

177.    She was miserable during the entire process.

178.    Mr. Wolfe was the one filming the shoot.

179.    It is unclear whether Ms. Moser was present during this "solo shoot."

180.    Ms. Doe I was given sex toys to use during this "solo shoot" which lasted hours.

181.    At some point during or immediately after the photo shoot, Mr. Wolfe sexually assaulted Ms. Doe I.

182.    After the "solo shoot" was done, Ms. Doe I was given food – the first she had all day.

183.    She then called Mr. Garcia to pick her up, which he did, and took Ms. Doe I back to his place.

184.    Mr. Garcia then sexually assaulted Ms. Doe I again.

185.    She called an Uber[19] to pick her up and take her to the airport on or around 5:00 AM.

186.    She got an early ride to the airport despite her flight back to Denver, CO, not being

---

[18] Ms. Moser entered a guilty plea to facts relating to this case. United States Attorney's Office, *GirlsDoPorn Employee Pleads Guilty to Sex Trafficking Conspiracy*, https://www.justice.gov/usao-sdca/pr/girlsdoporn-employee-pleads-guilty-sex-trafficking-conspiracy, (Apr. 16, 2021) (last visited January 15, 2025).

[19] Uber is an application that allows the user to call a licensed driver to take them from point A to point B. Uber, *About Us*, https://www.uber.com/us/en/about/?uclick_id=dfb539cc-a3a7-46dd-bfef-a6af8bcb2f7e (last visited January 7, 2025).

until later that day.

187.    This is because Ms. Doe I needed to get away from Mr. Garcia and Mr. Wolfe.

188.    These events, as described by Ms. Doe I, are eerily similar to numerous accounts of other young women victimized by the Defendants.

## D. LIFE AFTER THE "PHOTO SHOOTS"

    *i.    Denver Health*

189.    Plaintiffs hereby incorporate all previous paragraphs.

190.    Ms. Doe I returned to Denver, CO, and upon her return went to Denver Health[20] to be evaluated by their medical staff.

191.    Upon information and belief, Ms. Doe I underwent a physical exam to determine any injuries or diseases she may have suffered as a result of the sexual assaults.

192.    Ms. Doe I was told she had vaginal lacerations, but no sexually transmitted diseases.

193.    Upon information and belief, Ms. Doe I received medical care for her injuries.

    *ii.    Life Following the "Photo Shoot"*

194.    Plaintiffs hereby incorporate all previous paragraphs.

195.    Ms. Doe I did not tell her friends nor her family what occurred in California.

196.    Mr. Garcia blocked her on all social media applications and blocked her number.

197.    Ms. Doe I and Ms. Craig had a "falling out"[21] following the sexual assaults in

---

[20] Denver Health is a medical facility in Denver, CO, located at 777 Bannock Street, Denver, CO 80204. *See*, https://www.denverhealth.org/.

[21] A "falling out" is a situation "where people are not friends anymore, caused by a disagreement or an argument[.]" Oxford Learner's Dictionary, *Falling Out*, Oxford Learner's Dictionaries https://www.oxfordlearnersdictionaries.com/us/definition/american_english/falling-out#:~:text=falling%2Dout-,noun,I%20had%20a%20falling%2Dout (last visited February 18, 2025).

California.

198.    They did not speak about the incident, presumably from the trauma and shock it caused for both of them – especially Ms. Doe I.

199.    Upon information and belief, Ms. Doe I did not tell any family members about the sexual assaults either.

200.    Ms. Doe I tried to forget the sexual assaults, the sexual assault videos made, and move on.

201.    She hoped that neither would come back to cause her problems.

iii.    *"Photo Shoot" Distribution & Pornhub Involvement*

202.    Roughly a year following the "photo shoot" Ms. Doe I received a phone call from a friend of hers named James ("James").[22]

203.    James informed Ms. Doe I that the video of her sexual assault was on the GirlsDoPorn website. This GirlsDoPorn website directly provided monetary benefits to Pornhub, also known as Aylo.

204.    It was only at this time, Ms. Doe I realized she has been coerced, manipulated, and misled into filming a pornographic film for a popular pornographic website.

205.    Ms. Doe I found the video on multiple websites, including Pornhub.

206.    She tried to contact Mr. Garcia about this but was unable to find any reliable number or information for him.

207.    Ms. Doe I contacted multiple websites including, but not limited to, Pornhub and YouPorn, requesting that the video be removed.

---

[22] At the time of this filing, Counsel does not have James' last name.

208.    Desperate to get the video removed, Ms. Doe I tried anything – including stating she was underage.

209.    The video being on the websites was emotionally damaging and she desperately wanted it removed.

210.    None of these websites did not remove the video.

211.    Instead, these websites kept the video on their platforms – continuing to profit from the video.

212.    Further, she received an email from both GDP and Pornhub telling her that she had signed a contract and they would not remove the video.

213.    She received other cease and desist letters from Pornhub and related websites affirming they would not remove her sexual assault video. Exhibit 2 – Email Denying Removal.[23]

214.    Ms. Doe I took this letter in a threatening manner, because it was threatening.

iv.    *Ms. Doe I's Family Discovers the Pornographic Video*

215.    Another year passed and Ms. Doe I continued to try to keep the video as secretive as possible – despite it being online and GDP being promoted by Pornhub.

216.    Ms. Doe I began a relationship with a separate man (collectively "the couple"). She told him about the sexual assaults and video; he was gracious and understanding.

217.    The couple took a trip with some friends to Hawai'i. While in Hawai'i, Ms. Doe I took a nap one day enjoying her vacation.

---

[23] Counsel makes note that at this time Exhibit 2 is redacted for purposes of this Complaint and/or until this Court issues a protection order.

218.    She was awoken by her phone constantly buzzing.

219.    She was receiving a multitude of calls and text messages from family members and friends.

220.    Ms. Doe I, concerned about the alarming number of messages and calls she was receiving, had thought someone had died.

221.    Instead, she awoke to a text from her mother that read "You don't need to tell me why you did what you did but . . ."[24]

222.    It was then Ms. Doe I realized that her family members had discovered the video. She found out that someone had posted screenshots of the video on Facebook.

223.    Upon information and belief, Ms. Doe I believes the account that uploaded the video was a fake account.

224.    Following this, Ms. Doe I found out that – without her consent and without her knowledge – a "pornstar Instagram[25]" had been set up for her videos.

225.    Unlike Pornhub and its subsidiaries, when Ms. Doe I contacted Instagram to have the account removed, the account was removed within a few hours.

226.    Despite the unexpected reveal of Ms. Doe I's sexual assault video most friends were understanding.

v.    *Continued Fallout*

227.    As the video continued to be put on Pornhub and its subsidiaries' pages, including

---

[24] Counsel makes note that this message may not have read these exact words and it is possible this is a paraphrasing or rough recreation of a text message sent years ago now.

[25] Instagram is a social media account where people can post videos, photographs, and more, along with text descriptions. It can be referred to as "Insta" or "IG." A "pornstar Instagram" is one that centers around a pornographic actor or actress.

GDP, Ms. Doe I got more and more sexually explicit messages from people she did not know.

228.    The popular social media and discussion website, Reddit, had a subreddit (a specific forum) dedicated to GDP. Other websites, such as 8Chan, did as well.

229.    Some users on 8Chan worked to identify Ms. Doe I and other victims of GDP, releasing their names, schools, phone numbers, and addresses of those in the videos.

230.    Counsel was able to obtain these comments from the Way Back Machine on the Internet Archive. Internet Archive, *About the Internet Archive*, https://archive.org/about/ (last visited May 7, 2025).

231.    This tool builds a "digital library" of internet sites for up to 28 years' time of web history. *Id.* While it does not capture everything, it can capture some important notes.

232.    Ms. Doe I's video is one of the things it captured. Exhibit 3, Title Screen.

233.    Some users on Pornhub made comments that Ms. Doe appeared to be abused during the video or was crying. Exhibit 4, Comments I and II.[26]

234.    Some comments ignore the obvious sexual assault, but the comments in Exhibit 4 were posted not long after the video was uploaded according to their time stamp.

235.    This shows that Pornhub would have had actual knowledge of, in the very least, a clear sexual assault video potentially being promoted and permitted to stay on their platforms.

---

[26] Counsel makes note that Exhibits 3 and 4, as well as any other exhibits from webpages, have been redacted to remove Counsel's identifying information (e.g., storage sites that Counsel uses as well as personal email) and any other name identifying information of Ms. Doe I or Ms. Doe II. The exhibits have not been altered in any other way.

236. To this day Ms. Doe I will still receive sexually explicit messages from unknown parties.

237. Ms. Doe I has endured years of therapy and continues to attend therapy for the trauma caused by the sexual assaults.

238. As a result of the sexual assault trauma, and the videos of these sexual assaults being distributed & maintained online, Ms. Doe I suffers severe emotional distress.

239. Ms. Doe I goes through repeated fluctuations in her mood including, but not limited to, periods of great depression, lack of motivation, irritability, and difficulty forming emotional connections with others.

240. This has impacted her relationship with her significant other and her friendships with others.

241. She seeks consistent therapy and takes necessary medications to help her regulate any emotional swings she is having.

## III. MS. DOE II

### A. Initial Contact

242. Plaintiffs include all previous paragraphs.

243. In January or February 2017, Ms. Doe II was nineteen (19) years old.

244. She came across a potential modeling job on a website which, upon information and belief, was Craig's List.[27]

245. She read the advertisement which, upon information and belief, did not state

---

[27] Ms. Doe II believes she came across this job sometime in January or February, however, it could have been earlier or later. Craig's List is an online website where people can post about jobs, items they are selling, and more. CraigsList, *About*, https://www.craigslist.org/about/mission_and_history (last visited April 22, 2025).

anything about nudity nor pornography in either photography, videos, or other media.

246.    She responded to the advertisement's phone number and began speaking with a man who identified himself as "Jonathan.[28]"

247.    Upon information and belief, "Jonathan" was really Mr. Pratt.

248.    Ms. Doe II began talking through text messages and the conversation was professional.

249.    Eventually, "Jonathan" began asking more and more personal questions eventually asking for nude photographs of Ms. Doe II.

250.    Ms. Doe II continued to speak with Jonathan, who eventually told her that any modeling job would include nudity and pornography.

251.    Jonathan reassured Ms. Doe II that any photo shoot would be kept private, not posted on the internet, and only made for people in other countries.

252.    Upon information and belief, Ms. Doe II believes she was told specifically Australia and New Zealand.

253.    Ms. Doe II was reassured that everything would be on DVD including any videos, photographs, or any other material.

254.    Had she been aware of what was truly going on, Ms. Doe II would have never agreed to be part of a public, internet, pornographic film.

255.    Jonathan put Ms. Doe II in contact with another "model."

[28] "Jonathan" could also have gone by alternative spellings, such as "Jonathon" or "Johnathon." For purposes of this Complaint, Counsel will spell it as "Jonathan."

256. Ms. Doe II is not sure who this "model" was but, upon information and belief, this "model" is Ms. Moser.

257. Ms. Moser reassured Ms. Doe II that the job was safe.

258. She reassured Ms. Doe II that the pictures and videos would be kept private.

259. After this, "Jonathan" set up flights for Ms. Doe II to fly to San Diego, CA, from Florida, where Ms. Doe II was living at the time.

260. Ms. Doe II was told she would be paid five thousand ($5,000.00) for any participation in this photo shoot.

261. She was also told she would get more money if she actually showed up.

**B. Time in California**

262. Plaintiffs hereby incorporate all previous paragraphs.

263. Ms. Doe II only told her then-boyfriend she was going to California.

264. She did not tell him why she was going to California.

265. Once she landed at the airport in San Diego, she was picked up by Ms. Moser alone.

266. Ms. Moser drove her to a hotel.

267. Once they arrived, Ms. Doe II checked-in to the hotel and then went to sleep.

268. The following day she woke up, took a shower, and waited for the make-up artist, who remains unknown and unidentified, to arrive.

269. The makeup artist was late but, when they did arrive, they did Ms. Doe II's hair and makeup.

270. A cameraman, Mr. Theodore Gyi,[29] arrived to set the cameras up.

---

[29] Mr. Gyi was charged and convicted in criminal proceedings. United States Attorney's Office – Southern District

271.    Mr. Gyi had to bring in big lights, a big camera, and a bag of equipment.

272.    He was not conspicuous when bringing in these items through the hotel.

273.    Upon information and belief, hotel employees of the hotel would have noticed him bringing these items into the hotel.

274.    While setting everything up, Mr. Gyi made small talk with Ms. Doe II.

275.    Ms. Doe II was incredibly anxious during this entire process.

276.    At some point, Mr. Garcia showed up.

277.    He bragged to Ms. Doe II claiming he "did this for a living" and that he had "taken a pill for performance" among other things.

278.    Upon information and belief, at the time, Ms. Doe II recalls Mr. Garcia being a large, intimidating man.

279.    Mr. Garcia was much bigger than Ms. Doe II.

280.    Mr. Garcia was not kind.

## C. Contract and Video of Sexual Assault

281.    Plaintiffs hereby incorporate all previous paragraphs.

282.    Mr. Garcia gave Ms. Doe II a "contract" to sign.

283.    Mr. Garcia, nor anyone else in the room, gave Ms. Doe II an explanation of the contract.

284.    Upon information and belief, Ms. Doe II was told to just "sign [the contract] and talk about the details later."

---

of California, *Camerman Pleads Guilty in GirlsDoPorn Sex Trafficking Conspiracy*, United States Department of Justice (Jan. 21, 2021) (https://www.justice.gov/usao-sdca/pr/cameraman-pleads-guilty-girlsdoporn-sex-trafficking-conspiracy) (last visited Apr. 22, 2025).

285. Ms. Doe II tried to read the "contract."

286. The pressure of being 19 years old, in a room full of people she did not know well, alone in a city unfamiliar to her, and with a man much bigger than her was immense.

287. She was nervous already, but now she was nervous and scared.

288. From what she did read of the contract, Ms. Doe II recalls no mention of Girls Do Porn, nor anything about any video, photograph, or otherwise, being published online.

289. As she kept trying to review the "contract" Mr. Garcia kept rushing her saying "just sign this."

290. Ms. Doe II did not feel like she could review the "contract" with Mr. Garcia constantly pressuring and intimidating her.

291. She was never given a copy of the "contract."

292. After this, she was scared and continued to be intimidated in the immense and increasingly intimidating situation.

293. Ms. Doe II just wanted to go home.

294. Mr. Garcia constantly told Ms. Doe II that if they did not finish in time there would be a "problem."

295. This furthered the culture of fear that was created already. Ms. Doe did not know what the "problem" would be. She did not want to find out.

296. Ms. Doe II thought the problem may have been that she would miss her flight and not go home, but she was not sure.

297. Ms. Doe II was then told what to say and what to do every step of the way.

298. She was told to "act like she was enjoying it."

299. She was told "to smile."

300. She was told to "not be negative in any way."

301. She was told to keep her "eyes open."

302. The sexual assault that she endured was aggressive, chaotic, and she did not enjoy the sexual assault.

303. She did not consent in any way, shape, or form, to having sexual intercourse with Mr. Garcia.

304. Moreover, the environment of intimidation and fear did not provide one where Ms. Doe II could have reasonably consented to any sexual acts.

305. After the sexual assault Mr. Garcia smoked marijuana on the balcony and Ms. Doe II was told to go take a shower.

306. Immediately after the sexual assault video was done being filmed, Ms. Doe II felt disgusting, used, and like she was "dying inside."

307. Mr. Garcia drove Ms. Doe II to the airport and tried to make unfriendly small talk during the drive.

308. Ms. Doe II recalls Mr. Garcia driving erratically and at high speeds on the way to the airport.

309. All she could think about was going home, though.

310. She was just glad it was over. She was given $5,000.00, but no additional compensation.

**D. Return to Florida & Video Discovery**

311.    Plaintiffs hereby incorporate all previous paragraphs.

312.    Ms. Doe II returned to Florida, dealing with the fallout from her sexual assault and traumatic experience in San Diego, CA.

313.    About four (4) weeks after being back in Florida, Ms. Doe II's sister – her twin – came bursting into her room one day.

314.    She began yelling at Ms. Doe II about why she had filmed the sexual assault video.

315.    Ms. Doe II's sister found it on the internet after an unknown person sent her a link to the video.

316.    She then began getting messages from strangers on the internet, including threatening messages.

317.    Further, everyone in Ms. Doe II's hometown found the video.

318.    They would send her photographs of the sexual assault and/or links to the sexual assault video itself.

319.    These random messages and links to the sexual assault video persist today – occurring as often as one (1) to two (2) times a month.

320.    Ms. Doe II's mother, a high school employee in her hometown, found out, and also required therapy as a result.

321.    Ms. Doe II's mother did not speak with her for nine (9) months after finding out about the sexual assault video.

**E.  Therapy**

322.    Ms. Doe II has been attending therapy for the last six (6) years as a result of the sexual assault, the sexual assault video, and its publication online.

323.    She has worked hard to work through these traumatic events.

324.    She recognizes that as a result of them, she has post-traumatic stress disorder ("PTSD").

325.    Ms. Doe II will likely need therapy for the foreseeable future to continue to deal with these traumatic events.

## IV.    Internet Pornography Video Structure, Video Types, and Payments

### A.  Compilation Videos

326.    Plaintiffs hereby incorporate all previous paragraphs.

327.    A "compilation video" can be defined as "a collection of short snippets of a video – and the occasional image – that highlight something specific." Jonathan Chang-Soon, *Make Your Own Compilation Video in 5 Easy Steps*, Animoto Blog (Jan. 5, 2024)          https://animoto.com/blog/video-tips/online-video-complilation-maker#:~:text=A%20compilation%20video%20is%20a,clips%20from%20your%20big%20day (last visited January 16, 2025).

328.    According to Pornhub's website a compilation video can be broken down by action shot, position, model, theme, or category. Pornhub, *How to Make Compilation Content*, Pornhub, https://www.Pornhub.com/blog/how-to-make-compilation-content (last visited February 18, 2025).

329.    Pornhub promotes this style of video further, offering "some other tips and tricks to keep in mind" such as the length of the video, suggested titles, and providing other videos for "inspiration." *Id.*

330.    Compilation videos, by their very nature, include multiple clips that are spliced

together. *Id.*

331.    Because of the style of such videos, and Pornhub's encouragement to make such videos "at the very least 10 minutes in length," it is possible that an unknown number of videos have Plaintiffs' sexual assault video in such a compilation. *Id.*

332.    In Counsel's research, there is no definitive as to the longest compilation video on Pornhub, nor other pornographic websites, however some videos may be up to at least three (3) hours in length. Google, Google Search, https://www.google.com/ (go to main page and input question(s) "What is the longest compilation video on Pornhub?" or "What is the longest compilation video on YouPorn?" or "What is the longest compilation video on RedTube?").[30]

333.    Nothing to Counsel's knowledge limits length of videos on Pornhub or other similar pornographic cites operated by Defendants.

334.    Because of this, Plaintiffs' videos could, in a compilation video, continue to be on Pornhub in perpetuity, hidden within the compilation video(s).

**B.  Pornhub Structure and Alleged Commitment to Safety**

335.    Plaintiffs hereby incorporate all previous paragraphs.

336.    Pornhub's majority of visits come from the United States of America. Pornhub Insights, *2024 Year in Review*, Pornhub (Dec. 5, 2024) https://www.Pornhub.com/insights/2024-year-in-review (last visited January 15, 2025).

---

[30] Counsel makes note that the video length is in the Pornhub search result, noting that it is 3 hours in length. It was the first search result.

337.    In 2024, one of Pornhub's biggest search categories was "amateur" and "verified amateurs" which gained an increase of "+10" in search ranking from 2023. *Id.* (citing "Most Viewed Categories of 2024").

338.    In 2024, though female viewership increased, Pornhub's proportion of visitors was seventy-one percent (71%) male. *Id.* (citing "Proportion of Female Visitors.")

339.    One of the top categories searched by men was "amateur." *Id.* (citing "Most Viewed Categories by Gender.")

340.    Upon information and belief, Pornhub has published a "Year in Review" since at least 2013. Pornhub, *Pornhub Insights*, https://www.Pornhub.com/insights/page/2?s=Year+in+Review (search for "Year In Review" and go to page 2) (last visited January 15, 2025).

341.    In an opinion piece in the *New York Times* by Mr. Nicholas Kristof asserts that Pornhub profits off of many videos, including rape videos. Nicholas Kristof, *The Children of Pornhub*, The New York Times (Dec. 4, 2020) (last visited Jan. 15, 2025).

342.    Mr. Kristof makes note that Pornhub allows for videos to be downloaded directly from the website. *Id.*

343.    This means that, even if a video is removed from the website, it can be repeatedly uploaded to Pornhub or any other website. *Id.*

344.    While not noted in its 2024 Year In Review, in 2019, every minute 2.8 hours of video was uploaded to Pornhub. Pornhub, *The 2019 Year in Review*, Pornhub Insights    https://www.Pornhub.com/insights/2019-year-in-review    (last    visited

January 16, 2025).

345.   According to Pornhub "that means that every 9 minutes or so, an entire days' worth of video was uploaded to Pornhub." *Id.*

346.   Pornhub states that they "remain steadfast" in their commitment to eliminate non-consensual intimate material among other sexually abusive and improper material. Pornhub, *Our Commitment to Trust and Safety*, Pornhub Help Center (https://help.Pornhub.com/hc/en-us/categories/4419836212499-Our-Commitment-to-Trust-and-Safety) (last visited January 16, 2025).

347.   Pornhub notes that they voluntarily registered to report to the National Center on Missing and Exploited Children (NCMEC). *Id.*

348.   Pornhub has a "Verification, Upload, and Content Moderation Process." Pornhub, *Verification, Upload, and Content Moderation Process*, Pornhub Help Center (Dec. 2024)  (https://help.Pornhub.com/hc/en-us/articles/34927506861843-Verification-Upload-and-Content-Moderation-Process) (last visited January 16, 2025).

349.   Pornhub lists out its core values as "Consent, Freedom of Sexual Expression, Authenticity, Originality, and Diversity[.]" Pornhub, *Core Values*, Pornhub, https://help.pornhub.com/hc/en-us/articles/4419871944723-Core-Values   (last visited February 25, 2025).

350.   Specifically, under the "consent" issue, Pornhub states they define consent as "express, voluntary, and non-coerced agreement and willingness to engage in a specific sexual activity, and, where applicable, to produce, or disseminate content for a particular audience." *Id.* (noting this is under the "Consent" tab).

351.    Pornhub alleges they ensure consent from all persons in the video. *Id.* Moreover, they also claim that the videos should, per their recommendations, comply with their "Terms of Service." *Id.*

352.    Within Pornhub's terms of service they require that, prior to uploading, persons have "carefully ascertained and examined a valid government photo identification" of persons involved in the video. Pornhub, *Terms of Service*, Pornhub Terms of Service https://www.pornhub.com/information/terms#terms (last visited February 25, 2025), subsection "Rules Applicable to All Content and Uploads on This Website" part 3.

353.    This is simply not possible for those re-uploading previous pornographic content, nor content in a compilation video.

354.    Pornhub requires that prior to uploading that users make an account that is verified.

355.    This verification process is through their "Model Program" and only involves "3 easy steps[.]" Pornhub, *How to Sign Up and Join the Model Program*, Pornhub Help Center https://help.pornhub.com/hc/en-us/articles/4419879760403-How-to-Sign-Up-and-Join-the-Model-Program (last visited February 25, 2025).

356.    The video from Pornhub's "How to Sign Up" (embedded in the webpage) is short and only requires that those signing up provide proof of *their* age and verification of this through photographs. *Id.*

357.    The video does not, nor does the webpage itself, require that anyone before uploading verify the age, consent, or any other details, of the videos they are uploading explicitly. *Id.*

358. Instead, it is buried within the multi-page Terms of Service.

359. While Pornhub may "require" persons to read this, it is unclear if anyone actually does.

360. There are some requirements around uploading directly to Pornhub.

361. However, the requirements that Counsel has identified in their research are recent.

362. It is unclear at this time, with the information available to Counsel, what, if any, requirements were established previously.

363. Moreover, even if there were previous requirements, it is further unclear if they were enforced.

364. Given the consistent uploading and re-uploading of Ms. Doe I's sexual assault video, it is evident that they were not enforced heavily.

365. Pornhub boasts that there are 140 million daily users engaged and 600,000 active content creators. Exhibit 5 – Sign Up For Pornhub (Redacted for Modesty).

366. It does not differentiate between types of content creators (e.g., corporate entities, amateur, etc.).

367. Given the large number of active users and the hundreds of thousands of active content creators, it is unlikely that Pornhub is able to moderate all content that is uploaded to its website.

368. As noted previously in this Complaint, every sixty seconds, 2.8 hours of footage is uploaded to Pornhub. *See, supra.*

369. Articles have pointed to the issue of the lack of content moderators Pornhub employs, as recently as 2023.

370. In Meghan Amin's article, *Pornhub Whistleblower Says Moderators Asked to Check 800-1000 Videos Per Eight Hour Shift*, she identifies that one Pornhub employee identifies that they were supposed to review at least 700 videos per shift, if not more. Meghan Amin, *Pornhub Whistleblower Says Moderators Asked to Check 800-1000 Videos Per Eight Hour Shift*, Metro https://www.ladbible.com/entertainment/money-shot-the-pornhub-story-netflix-documentary-378221-20230314 (last visited February 25, 2025).

371. This person also noted that "many videos that should have been taken down stayed up for months." *Id.*

372. This time period that the video was "up" (meaning available without restriction online) gives persons plenty of time to access, download, and save the videos – or disseminate them elsewhere.

373. Allegedly, at the time the article was written, there were "30 moderators." *Id.*

374. Assuming there are 30 content moderators, even if each worked eight (8) hours a day with no breaks they could review one-hundred and twenty (120) hours' worth of footage in total.

375. Or, per Pornhub in 2019, about 45 minutes of a days' uploading time. *See, supra*.

376. This would mean that, in order to get through nine (9) minutes' of time – equivalent to one (1) days' worth of material uploaded – it would take thirty-two days' time.[31]

377. In essence, for every nine (9) minutes on Pornhub, it takes over one (1) month to

---

[31] This is assuming thirty (30) available moderators all working eight (8) hour shifts and a standard day has 1,440 minutes (60 minutes * 24 hours = 1,440).

review all material uploaded.

378.    This is assuming that no moderator takes a moment off, calls-in sick, nor requires extra time to review certain footage to determine its validity. Were that the case, the review process could take even longer.

379.    Even if there are more than thirty (30) moderators, to have the necessary amount to review all uploaded material in a single (1) hour span would require a minimum of 480 moderators.[32]

380.    That is, at a minimum, an additional 450 moderators to, just barely, keep pace with the daily upload amounts.

381.    It is impossible that Pornhub adequately reviews every video that is uploaded.

382.    As Dani Pinter, then-senior legal counsel at the National Center of Sexual Exploitation stated in one interview it is "impossible [for reviewers to see all content] [s]o, of course, they were-fast forwarding, skipping through." Gregory Robinson, *Pornhub Moderators Had to Review '700 Videos Per Day' But Were Expected to Watch More*, LAD Bible (Mar. 15, 2023) https://www.ladbible.com/entertainment/money-shot-the-pornhub-story-netflix-documentary-378221-20230314 (last visited February 25, 2025).

383.    She went on to state that this 'review' occurs with "[n]o sound, which is key

---

[32] Counsel got to the following conclusion by the following equation below, but Counsel makes note that it is his own equation:

$$f(Number\ of\ Moderators)$$
$$= \left[\left(\frac{60\ minutes\ per\ hour}{9\ minutes\ per\ 24\ hours\ of\ material\ uploaded}\right) * (24\ hours\ a\ day)\right]$$
$$* 24\ hours\ in\ a\ day) / (8\ hours\ per\ shift).$$

because sometimes the women and – or children – in the videos are crying, yelling, saying 'No,' saying 'Stop.' And [the reviewers] are not catching any of that." *Id.*

384.  This includes content that is non-consensual, contains child pornographic images, or other sexually explicit and illegal material.

385.  This includes re-uploads of Ms. Doe I's sexual assault video on Pornhub or its other websites.

386.  This includes re-uploads of Ms. Doe II's sexual assault video on Pornhub or its other websites.

387.  This includes Ms. Doe I's sexual assault video being within the multiple minute videos that Pornhub encourages. This could be uploaded to Pornhub or its other websites.

388.  This includes Ms. Doe II's sexual assault video being within the multiple minute videos that Pornhub encourages. This could be uploaded to Pornhub or its other websites.

389.  This includes potential images (screenshots or otherwise) of Ms. Doe I's sexual assault video that could be uploaded to Pornhub or its other websites.

390.  This includes potential images (screenshots or otherwise) of Ms. Doe II's sexual assault video that could be uploaded to Pornhub or its other websites.

391.  This includes potential GIFs[33] that could be made of Ms. Doe I's sexual assault video and uploaded to Pornhub or its other websites.

---

[33] A "GIF" stands for "Graphics Interchange Format" and has basic animations popular on social media websites. Adobe, *GIF Files*, Adobe – Photography https://www.adobe.com/creativecloud/file-types/image/raster/gif-file.html (last visited February 25, 2025).

392.    This includes potential GIFs that could be made of Ms. Doe II's sexual assault video and uploaded to Pornhub or its other websites.

393.    As this Complaint has stated, Ms. Doe I's video will exist in some way, shape, or form on the internet – Pornhub or its subsidiaries, in perpetuity.

394.    As this Complaint has stated, Ms. Doe II's video will exist in some way, shape, or form on the internet – Pornhub or its subsidiaries, in perpetuity.

## C.  Credit Card Payments

395.    Plaintiffs hereby incorporate all previous paragraphs.

396.    At the time of filing this Complaint, Pornhub no longer accepts credit card companies and is only accepting Automated Clearing House (ACH) wires.

397.    While companies like Visa have had a ban in place on certain Pornhub products, previously the credit card companies permitted use of their payments to Pornhub. Reuters, *Visa Continues Pornhub Ban, to Allow Card Use on Some of Its Parent's Sites*, Reuters (Dec. 23, 2020) https://www.reuters.com/article/business/visa-continues-pornhub-ban-to-allow-card-use-on-some-of-its-parents-sites-idUSKBN28X2CB/ (last visited February 25, 2025).

398.    Upon information and belief, Visa, Mastercard, and Discover Card, permitted their clientele to use their respective credit cards to make purchases for Pornhub Premium.[34]

399.    The price may have altered over the years, but currently Pornhub premium is $14.99

---

[34] Pornhub premium is "like the Pornhub you know and love but way better. It's got tons of added features and content." Pornhub, *What is Pornhub Premium?*, Pornhub Help Center https://help.pornhub.com/hc/en-us/articles/4419873379731-What-is-Pornhub-Premium (last visited February 25, 2025).

(USD) per month. Pornhub, *How Much Is It?*, Pornhub Help Center, https://help.pornhub.com/hc/en-us/articles/4419877632787-How-much-is-it (last visited February 25, 2025).

400.    Upon information and belief, Visa, Mastercard, Amex, and Discover, all permitted and allowed their users to pay for Pornhub premium, and other pornographic subscriptions, which they benefitted from.

401.    As part of Pornhub premium, persons were given access to GDP videos.

402.    Because of this, Visa, Mastercard, Amex, and Discover all benefitted from their clients signing up for Pornhub premium.

403.    Upon information and belief, Ms. Doe I's video was one of those videos that persons could get access to from Pornhub premium.

404.    Upon information and belief, because Ms. Doe I's video was in Pornhub premium these credit card companies benefitted monetarily and otherwise from this.

405.    Upon information and belief, Ms. Doe II's video was one of those videos that persons could get access to from Pornhub premium.

406.    Upon information and belief, because Ms. Doe II's video was in Pornhub premium these credit card companies benefitted monetarily and otherwise from this.

## V. Impacts on Plaintiffs

### A. Impacts on Ms. Doe I

407.    Plaintiffs include all previous paragraphs.

408.    As a result of Pornhub's repeated decisions to keep Ms. Doe I's sexual assault video on its platforms (including, but not limited to, Pornhub, YouPorn, Tube8, and

others), she has suffered extensive damages.

409. Ms. Doe I was sexually assaulted in the video in question.

410. This sexual assault has had severe, negative impacts on Ms. Doe I's personal, physical, and mental health.

411. Ms. Doe I requires intensive therapy to adequately deal with the repercussions of this sexual assault.

412. Moreover, as previously stated, Ms. Doe I suffered physical injuries as well – while unclear at this time, these are likely on display in her sexual assault video.

413. Ms. Doe I has had to deal with trauma from her sexual assault video being online, whether from direct uploads, re-uploads, or potentially being in compilation videos, constantly.

414. Counsel has retained an investigator for this matter.

415. This investigation has led counsel to clarify that the video will not ever be able to be removed from the internet.

416. There are persons who could have saved the video to their own personal files and distribute among their own friends or upload it to other pornographic websites.

417. Pornhub, and it subsidiaries, heavily pushes videos once uploaded to its website.

418. Each time it is uploaded it is promoted through Pornhub.

419. Every time the video is viewed, Ms. Doe I suffers the trauma of knowing, or not knowing, that another person watched her sexual assault video.

420. She has problems maintaining intimate relationships.

421. She has problems with intimacy.

422.    Ms. Doe I suffers from PTSD because of the sexual assault, sexual assault video, and its constant uploading.

423.    Ms. Doe I suffers from generalized anxiety disorder.

424.    Ms. Doe I suffers from bipolar II disorder which has been exacerbated as a result of the sexual assault, the sexual assault video and its constant uploading to Pornhub.

425.    Ms. Doe I has been attending consistent therapy for some time now to deal with the damages as a result of her sexual assault video being available to any personnel online.

i.    *Doxxing and its Impacts on Ms. Doe I*

426.    Plaintiffs hereby incorporate all previous paragraphs.

427.    Because Ms. Doe I's sexual assault video was posted and kept online, she has been doxed.

428.    Doxxing is when a person or entity "publicly identif[ies] or publish[es] private information about (someone) especially as a form of punishment or revenge[.]" Merriam-Webster, *Dox*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/doxxing (last visited March 25, 2025).

429.    The University of Maryland describes doxxing as "the malicious act of publicly revealing someone's private or personally identifiable information online without their consent." University of Maryland, *What to do if you've been doxed*, Office of General Counsel https://ogc.umd.edu/doxing (last visited March 25, 2025).

430.    Notably, the University of Maryland makes note that doxxing[35] "can include,

---

[35] Doxxing can be spelt with one or two x letters. *Dox,* Merriam-Webster.

without limitation, someone's private email address, phone number, home address, family address, financial details or sensitive documents" and can result in "stalking, identity theft, physical harm and even job loss." *Id.*

431.    Equality Now is "a feminist organization using the law to protect and promote human rights of all women and girls." Equality Now, *What We Do*, Equality Now https://equalitynow.org/what-we-do/ (last visited March 25, 2025).

432.    In February of 2024, Equality Now published a press release titled "Lack of Legal Protections Against Doxing Is Putting Women At Greater Risk of Online Stalking And Harassment[.]" Equality Now, *Lack of Legal Protections Against Doxing Is Putting Women At Greater Risk of Online Stalking And Harassment*, Equality Now (Feb. 28, 2024) https://equalitynow.org/press_release/lack-of-legal-protections-against-doxing-is-putting-women-at-greater-risk-of-online-stalking-and-harassment/ (last visited March 25, 2025).

433.    Equality Now indicates that doxxing often includes the "non-consensual sharing of intimate images" such as sexual images. *Id.*

434.    Ramifications of doxxing can include "physical intimidation and violence" as well as loss of economic opportunities. *Id.*

435.    Since Ms. Doe I's video was uploaded to Pornhub and other websites, she has been doxxed repeatedly.

436.    Without much effort, Counsel was still able to find previous links to Ms. Doe Is' videos – specifically naming the "episode" number as well.

437.    Counsel was able to find this on the Reddit[36] page "r/pornID" where the stated goal is to "help you identify a stage name, professional name, or screen name of a porn performer or a full video from a gif, etc." r/pornID, *Help a [redacted] out*, Reddit.com/r/pornID/ (last visited March 25, 2025).

438.    By going to this and searching "GirlsDoPorn" multiple postings come up.

439.    Eventually one is able to find a post titled "Anyone know who the female is?" with the comment responding that it is Ms. Doe Is' video. Exhibit 6 – Reddit Post.[37]

440.    Counsel for Ms. Doe I retained an investigator to examine the accessibility of Ms. Doe Is' sexual assault video online.

441.    Counsel's investigator was able to find over three-hundred (300) links involving Ms. Doe Is' sexual assault video.

442.    Since Ms. Doe Is' video was uploaded – without her consent – she has repeatedly received sexually explicit messages from unknown persons to her personal social media accounts.

443.    Moreover, any person can, with relative ease, discover Ms. Doe Is' sexual assault videos online.

444.    This puts Ms. Doe Is' future job prospects at risk.

445.    An employer may not understand the history of the video and may choose to not hire Ms. Doe Is as a result.

---

[36] Reddit is an online forum website that is "home to thousands of communities, endless conversation" and where a person can explore their interests. Reddit, *The Heart of the Internet*, Reddit.com https://redditinc.com/ (last visited March 25, 2025).

[37] In accordance with Ms. Doe Is' privacy, the official name has been redacted for purposes of this filing. Following the process of discovery, Counsel is happy to provide opposing Counsel with an un-redacted copy.

446.    Moreover, should Ms. Doe I decide go on to have children, or engage in other serious relationships, these are also at risk.

447.    Ms. Doe I may have to explain to new significant persons in her life that there is a video, constantly floating around the internet and easily searchable, of her sexual assault online that they, or their friends, may watch.

448.    Or, if she has kids, she may have to explain to them why one of their parents has an alleged sexual assault video online. This is also a video that any of her potential kids' friends may find and then ask her kids about.

449.    Again, this is aside from the constant and invasive online harassment Ms. Doe I already faces with the sexual assault video being online in perpetuity.

450.    Ms. Doe I continues to be harassed online by unknown persons because Pornhub kept her video online.

451.    Ms. Doe I is entitled to damages as a result of Defendants' conduct.

**B. Impacts on Ms. Doe II**

452.    Plaintiffs hereby incorporate all previous paragraphs.

453.    As a result of Pornhub's continued use of, and decision to keep, Ms. Doe II's sexual assault video on its platforms (including, but not limited to, Pornhub, YouPorn, Tube8, and others), Ms. Doe II has suffered damages.

454.    The sexual assault has had severe negative impacts on Ms. Doe II's personal, mental, and emotional health.

455.    Ms. Doe II has had to deal with the trauma of having her sexual assault video online, or photographs online, constantly.

456.    Like the investigator for Ms. Doe I has stated, this video will never truly go away.

457.    Persons can have saved the video to their own personal files and distribute among their own friends or upload it to other pornographic websites.

458.    Pornhub, and its subsidiaries, heavily promotes videos once uploaded to their website.

459.    Each time the video is uploaded it is promoted through Pornhub.

460.    Every time the video is viewed Ms. Doe II suffers the trauma of knowing, or not knowing, that another person has watched her sexual assault video.

461.    Ms. Doe II also suffers from PTSD because of the sexual assault and the difficult it has created in her life.

*i. Doxxing and its Impacts on Ms. Doe II*

462.    Ms. Doe II suffers the impacts of doxxing, with people she does not know, or does know, reaching out to her once a month.

463.    She is constantly reminded that people can view her sexual assault video and pass unfair and incorrect judgment on her.

464.    Upon information and belief a few months after the sexual assault video was made Ms. Doe II went to work as a gymnastics instructor.

465.    Ms. Doe II had done gymnastics her entire life and was part of the YMCA gymnastics program in Florida where she taught gymnastics.

466.    This job was important to her and Ms. Doe obtained the job by showing the YMCA her gymnastics background.

467.    When going into work one day her district manager and her manager asked to meet

with them privately.

468.    They informed Ms. Doe II that they had received an email from an unknown person who was not a member of the YMCA.

469.    Ms. Doe II is unaware of who this person is and when the email was sent.

470.    This person emailed Ms. Doe II's manager the link to her sexual assault video.

471.    Upon information and belief this email inquired about why the YMCA would hire such a person like Ms. Doe II and implied it was a bad decision because of the video in the link.

472.    Fortunately for Ms. Doe II, her district manager and manager at the time were understanding. But Ms. Doe II was still very upset and began sobbing in a private space.

473.    Ms. Doe II knows that, while not fired, her job was certainly more difficult following this experience.

474.    Moreover, this demonstrates the ability of any person to contact any person in Ms. Doe II's life with the sexual assault video.

475.    An employer may not understand the history of the video or photographs and may choose not to hire Ms. Doe II.

476.    Should Ms. Doe II go on to have children, or engage in other serious relationships, these are also at risk.

477.    Ms. Doe II will have to explain to new significant persons in her life that there is a video, constantly floating around the internet and easily searchable, of her sexual assault online that they – or their friends – may watch.

478.  Or, should she have kids, she has to explain to them why one of their parents has an alleged sexual assault video online. This is also a video that her potential kids' friends may find and ask her kids about.

479.  This is in addition to the constant online harassment that Ms. Doe II already faces with her sexual assault video being online in perpetuity.

480.  Ms. Doe II continues to be harassed online by unknown persons because Pornhub kept the video online.

481.  Ms. Doe II is entitled to damages a result of Defendants' conduct.

## REQUESTED RELIEF & CLAIMS

**WHEREFORE** Ms. Doe I and Ms. Doe II, respectfully pray for judgment against each and all of the defendants upon each and all of the claims for relief asserted herein above, including and without limitation:

### FIRST CLAIM FOR RELIEF
### TRAFFICKING VICTIMS PROTECTION ACT
### 18 U.S.C. §§ 1591, 1595
### (All Defendants)

482.  Plaintiffs hereby incorporate all previous paragraphs.

483.  Defendants knowingly used the instrumentalities of interstate commerce to violate 18 United States Code ("U.S.C.") section 1595.

484.  All Defendants knowingly benefitted from sex trafficking material.

485.  All Defendants knowingly benefitted from the videos, photographs, GIFs, and all and other forms of media created from the sexual abuse material.

486.  All Defendants knowingly benefited by making profits from this material at Ms. Doe I's expense.

487. All Defendants knew, or should have known, that the videos, images, photographs, GIFs, any other related materials, as well as use of their respective spaces to create the videos related to Ms. Doe I's sexual assault were a result of sex trafficking.

488. Defendants gained monetarily from Ms. Doe I's sexual assault video.

489. Defendants permitted and/or promoted the sexual assault video to be made at their premises or advertised the video to make revenue from.

490. All Defendants had reasonable opportunity, or should have had a reasonable opportunity, to observe Ms. Doe I's sex trafficking status, or the sexual assault video uploaded to their respective websites.

491. Defendants' conduct has harmed Ms. Doe I, emotionally, financially, physically, psychologically, and her reputation.

492. Ms. Doe I is entitled to damages as a result of Defendants' conduct.

## SECOND CLAIM FOR RELIEF
## TRAFFICKING VICTIMS PROTECTION ACT
## 18 U.S.C. §§ 1591, 1595
**(All Defendants)**

493. Ms. Doe II hereby incorporates all previous paragraphs.

494. Defendants knowingly used the instrumentalities of interstate commerce to violate 18 United States Code ("U.S.C.") section 1595.

495. All Defendants knowingly benefitted from sex trafficking material.

496. All Defendants knowingly benefitted from the videos, photographs, GIFs, and all and other forms of media created from the sexual abuse material.

497. All Defendants knowingly benefitted by making profits from this material at Jane Does' expense.

498.    All Defendants knew, or should have known, that the videos, images, photographs, GIFs, any other related materials, as well as use of their respective spaces to create the videos related to Ms. Doe II's sexual assault were a result of sex trafficking.

499.    Defendants gained monetarily from Ms. Doe II's sexual assault video.

500.    Defendants permitted and/or promoted the sexual assault video to be made at their premises or advertised the video to make revenue from.

501.    All Defendants had reasonable opportunity, or should have had a reasonable opportunity, to observe Ms. Doe II's sex trafficking status, or the sexual assault video uploaded to their respective websites.

502.    Defendants' conduct has harmed Ms. Doe II, emotionally, financially, physically, psychologically, and her reputation.

503.    Ms. Doe II is entitled to damages as a result of Defendants' conduct.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**DATED** this 16th day of June 2025.

Respectfully Submitted,

*/s/Scott C. Hammersley*
Scott C. Hammersley, Reg. No. 56617
Wadi Muhaisen, Reg. No. 34470
Muhaisen & Muhaisen, LLC
1225 17th Street Suite 2520
Denver, Colorado 80202
Tel: 303-872-0084
Fax: 303-309-3995
scott@muhaisenlaw.com
wadi@muhaisenlaw.com

Plaintiffs' Address:

c/o Muhaisen & Muhaisen, LLC
1225 17th Street
Suite 2520
Denver, CO 80202